# COMMISSION COURT OF TEXAS, 1881.

## N. N. DAWSON v. J. H. SPARKS.

### (Case No. 4190.)

1. RESCINDING CONTRACT FOR FRAUD.— The owner of a tract of land, having been induced to exchange it for a stock of cattle, on the faith of representations of his vendee as to number and quality of the cattle, which representations were false, is entitled, on the discovery of the fraud, to have the contract rescinded.. Kerr on Frauds, 334.

2. TIME IN WHICH TO RESCIND — OFFER TO RETURN PROPERTY.— One who has been defrauded, and entitled on that account to rescind a contract, must seek the remedy with reasonable dispatch. He may return the property received by him in the condition it may be in at the time of the discovery of the fraud, if he offers to do so immediately thereafter, and is not himself in default in making timely discovery of the fraud. He must offer to rescind as soon as circumstances permit, and must not go on with the contract after the discovery of the fraud, so as to increase the injury necessarily caused to the fraudulent party by the rescission. 2 Par. on Con. (5th ed.), 780; 41 Ga., 171; 3 Johns. Ch., 23; 17 Johns. Ch., 437; 11 How. Prac. R., 527; 32 Vt., 31; 24 Wend., 74; 40 Cal., 542; 21 Wis., 88.

3. STATU QUO.— Where the whole contract is contaminated with fraud, and the parties can be placed *in statu quo*, the contract may be rescinded, though the defrauded party does not lose his right to rescind because the contract has been partly executed, and the parties cannot be fully restored to their former position. 1 J. J. Marshall, 53; 1 Sm. & M. Ch., 126.

4. INABILITY TO RESTORE TO FORMER CONDITION.— Inability to restore the party who has committed the fraud to his former condition, which will prevent a rescission of the contract for discovered fraud, must be attributable to some fault on the part of the party complaining, or else it must arise from such dealings by him with the property by his own voluntary act, by sale, or other disposition of it, as to have disabled him to control it, and thereby restore its possession and enjoyment to the other party. 8 Howard, 158; 8 Cranch, 476; 9 Ind., 572.

5. Offer to return property before suit to rescind.— To entitle a party to a decree rescinding a contract for fraud, he must offer to return the property which he has received before the institution of his suit, and if he does so, and is in other respects entitled to rescission, and the party who has committed the fraud refuses to accept, he will not be held bound to keep and preserve the property after filing his suit. Having placed himself *rectus in curiæ*, his only duty after suit brought is to do nothing with the property. 22 Ala., 259; 4 Litt. (Ky.), 12.

6. Defrauded party not bound to preserve perishable property before bringing suit to rescind.— If property is of a perishable nature, a party who has been defrauded is not bound to keep it in a state of preservation until suit is brought to rescind. Kerr on Frauds, 337.

7. Rescinding in part.— If a transaction is severable, inability to rescind it as to a part is not fatal to the right to rescind as to another part, and inability to put the parties precisely *in statu quo*, because the property cannot be restored in specie, will not prevent a decree for rescission of the contract where relief may be granted under such decree as will do justice to both parties. 1 Barb., 125.

8. Lapse of time in discovering fraud.— One who has been defrauded by false representations on which he relies, and has no cause to suspect their untruth, is not, by mere lapse of time during which the fraud was not discovered, nor could by the exercise of diligence have been discovered, to be deemed as having waived the fraud, or as confirming the contract; nor will such lapse of time affect his right to rescind after such fraud shall be discovered.

9. Principal and agent — Notice.— A principal is not bound to take notice of facts coming to the knowledge of his agent before the agency existed.

10. Charge of the court.— When, under the evidence, a charge given by the court to the jury could not have worked an injury to the party complaining, the giving it, if erroneous, affords no ground for reversal.

11. Same.— A charge asked to be given, which gives undue prominence to isolated facts, should be refused. The charge must not lead the jury to infer what the opinion of the judge is upon facts before them. 17 Tex., 48; 19 Tex., 232; 18 Tex., 405; 14 Tex., 655.

Appeal from Falls. Tried below before the Hon. L. C. Alexander.

In December, 1866, J. H. Sparks brought suit against N. N. Dawson to recover a certain tract of land in McLennan county. The suit was based upon allegations to the effect that plaintiff had conveyed to defendant the land in October, 1865, in consideration of a stock of cattle which de-

fendant owned, and that defendant had misrepresented the cattle, as to their number, quality, etc., and the plaintiff had thereby been deceived and defrauded. The defendant denied all the allegations in the petition charging fraud and misrepresentation. He also set up as defense that plaintiff had neglected the cattle during the time he had had them in possession and they were of less value on account of such neglect than when plaintiff received them. Defendant also set up that after the suit was commenced plaintiff abandoned the cattle on the range, and they had been destroyed or stolen, and that by reason of such abandonment and loss, plaintiff could not recover the land.

On 24th of February, 1880, plaintiff's cause of action is fully stated by his first amended original petition.

Plaintiff alleges therein, in substance, that in August, 1865, he was the owner of two tracts of land, contiguous, in McLennan county, containing seven hundred acres of land, three hundred in cultivation — Brazos bottom — and houses, out-houses, etc., etc., of the annual rental value of $5 per acre.

That plaintiff Sparks then resided in McLennan county; defendant in Comanche county, one hundred and ten miles distant from plaintiff's residence.

That plaintiff did not know defendant until within a day or two of the trade below stated.

That defendant represented to plaintiff that defendant was the owner of a stock of cattle — *well kept and gentle* — consisting of at least eight hundred head, one hundred of which were beeves from four to six years old, eighty of which were beeves three years old — all of which defendant kept at his ranch in Comanche county.

That defendant stated that he knew the number of his cattle because he had at two short drives made away from the home range in the spring of 1865, penned at his ranch five hundred head, and could have easily penned three hundred head more in two days run around the ranch.

That he had one hundred and sixty acres of land, on which he lived.

Plaintiff inquired of a neighbor of plaintiff, one Webster, a brother-in-law of defendant's, as to defendant's reliability. Webster stated that he would believe what defendant told him.

That relying solely on Dawson's statements, and without any opportunity of knowing anything else about defendant's cattle, plaintiff traded his place, seven hundred acres of land, for defendant's ranch and cattle, and the contract was reduced to writing and signed by them, dated August 25, 1865.

That this was consummated by mutual conveyances, October 21, 1865.

That plaintiff had no opportunity of knowing, either before August 26th or October 21st, anything of the cattle, and that when the trade was consummated in October that the representations were repeated by defendant, and that the whole was done by plaintiff, he relying solely on defendant's representations; that all those representations were false and made to deceive.

That after the trade plaintiff employed William and Frank Jeffries to take charge of the cattle, who were recommended to plaintiff by defendant.

That at the time of trade it was agreed that William Dawson, son of defendant, who was represented by defendant as being his principal stock keeper, was to assist in gathering the stock for plaintiff in the spring of 1866.

The plaintiff was absent from early spring until December of 1866, having gone to Mississippi with a drove of horses.

That William Dawson went up to gather the stock of cattle in the spring, and returned after an absence of six weeks, reporting he could only find fourteen of the stock.

That plaintiff never knew of the falsity of the defendant's representations until he learned this while plaintiff was in Mississippi; that he immediately sold his remaining horses at auction, hastened home, and immediately went to defendant and proposed a rescission, tendering back the cattle, ranch, offering to reconvey, and demanding possession of

and reconveyance of land and premises conveyed by him to defendant; and stated to defendant he would have nothing more to do with the cattle; that he so informed Jeffries; and never had used any of the cattle and nevermore had anything to do with them; brought his suit, prayed for a rescission, etc.

Dawson denied, specially, in his answer, all the charges of fraud; denies that he represented any particular number of cattle or beeves as belonging to the stock; alleges that he told Sparks that he did not know exactly the number of his cattle; told him he kept cattle books, and he thought his books called for about eight hundred head; and while Sparks was writing the contract, he told him to insert the words "eight hundred head," which was done; alleged that when Sparks was writing the bill of sale in October, 1865, he then told Sparks that his stock book only called for seven hundred and fifty head, as he had ascertained after examination; that as he had represented to him, Sparks, that he thought the books called for eight hundred head, he, Dawson, had bought a small stock of thirty head running in the same range, and had left in the range a yoke of oxen, which he proposed to bill of sale also, in order to make his representation more nearly correct as to what his book called for; that he sold the cattle by the mark and brand, as they run on the range, the number to be ascertained by the book which he kept, and that Sparks so bought them. The answer avers that at the time of the trade Sparks was laboring under the apprehension that the land would be confiscated by the United States government, and if not confiscated that heavy back taxes would be imposed on the land and collected, and on this account he, Sparks, was anxious to dispose of his land, and in the executory contract, he, Dawson, at the instance of Sparks, became responsible for all back taxes which might be assessed against the land; and again in October, 1865, Sparks inserted the same obligation in the deed which he made to Dawson. The answer avers that this obligation was an important part of the consideration of the contract and understood by the parties; and that Sparks made no

complaint of his trade until the lapse of sixteen months, and until all fears of confiscation and back taxes had passed, and until the government was reconstructed. The answer charges that Sparks was moved to institute the suit because of the fact that his fears and apprehensions as to confiscation and taxation were unfounded, and not because of the alleged misrepresentations and fraud.

There have been six jury trials of this case, resulting in four mistrials, and two verdicts; one of which was for the defendant, on which a judgment was rendered, and on appeal to the supreme court was reversed and remanded; the other was rendered for the plaintiff, the judgment on which is now sought to be reversed on this appeal.

*Sleeper, Jones & Kendall, John L. Dyer* and *Goodrich & Clark,* for appellant.

*Herring, Anderson & Kelley,* for appellee.

Walker, P. J.— A report of the former appeal is to be seen in 47 Tex., 138. The statement of the case says that a detail of the facts testified to would serve no useful purpose. . . . That over fifty witnesses were examined, most of whom assumed to be familiar with the same facts about which they testified, and one-half of them were contradicted by the other. The same remarks are applicable to the record now before us, with the variation, however, in the statement as to the number of witnesses who testified on the last trial, they having increased from fifty to about one hundred and twenty.

Chief Justice Roberts, in the opinion of the court delivered by him, remarked that " the evidence was conflicting, each party having adduced ample evidence in support of the cause of action on the one hand, and of the defense on the other. If, therefore," he added, " there is no error in the charge of the court, by which the jury was misled, the verdict and judgment in favor of the defendant cannot be disturbed." In these respects, likewise, the case has lost none of its former features, and the rule of law then ap-

plied is not less applicable now, notwithstanding the reversed situation of the litigants as respects the opposite results of the two respective trials.

The verdict in favor of the plaintiff affirms the truth of every allegation made by him which is essential to maintain the action, and there exists in the record a profusion of evidence to support the conclusion at which the jury arrived in their verdict. The case is one notably abounding in conflicting testimony, one in which the jury needs must determine the truth from the whole of it, by duly considering, comparing, weighing and reconciling all of its parts as best they may, after the discussion of the counsel engaged at the trial, of its credibility, pertinency and weight, under the rules and principles of law applicable to it, as given in the instructions of the court. The record discloses a mass of evidence which is consistent in its continuous conflict respecting facts which are material and important, for they all mainly bear upon the decisive issues presented for determination. It is the peculiar province of the jury thus to determine upon the facts which are disputed, and they having performed that duty, we cannot interfere with their action because of mere conflict of evidence, after the district judge presiding at the trial, in the exercise of his discretion, has approved the verdict by refusing to grant a new trial. This view must determine adversely to the appellant his second assignment of error, "that the court erred in overruling the motion for new trial, because the great preponderance of testimony, as shown by the statement of facts, is in favor of the defendant on all the issues presented by the pleadings." The verdict is amply supported by the evidence; there is sufficient evidence to maintain the cause of action set out by the plaintiff, and the evidence in support of the matters of defense does not greatly preponderate against the finding of the jury upon the issues in the case.

The appellant assigns over twenty grounds of error; the legal questions which they involve relate, mainly, to the correctness or incorrectness of the charge of the court; to its refusal to give the instructions asked by the defendant,

and to the proper legal conclusions deducible from the facts of the case as shown by the evidence.

The charge of the court was full and comprehensive, embracing sufficiently in its details the various phases under which the issues between the parties required the jury to consider the evidence, for a proper determination of their rights. Its length precludes the insertion of it here as a whole. We will consider such parts of it as are questioned by the instructions asked to be given, and refused by the court, and the most material parts of it, the giving of which is assigned as error.

It will be found convenient to consider the questions presented by the record, in their logical order, beginning with the consideration of the general maxims on which courts of equity act in the rescission of contracts, and the exceptions that relate to them.

The fundamental rule is, "that if a contract has been induced by false representations, or a transaction is in any way tainted by fraud, and the defrauding party is a party to the transaction, the transaction will, even after conveyance and payment of the purchase money, be set aside, if the nature of the case and the condition of the parties will admit of it; or the defrauding party will be compelled to make his representations good." Kerr on Frauds, 333.

The elements of the rule, then, upon which a rescission may be decreed are, first, that the contract should have been induced by false representations; and secondly, that the nature of the case and the condition of the parties will admit of it. The defense disputes the plaintiff's cause of action, under issues of fact upon the first branch, and upon issues of law as to the application of the facts of the case, upon the second branch or division of the rule above given.

The defendant urged, on the trial, that the contract was not induced by the alleged false representations; that the plaintiff did not rely upon their truth as the inducement to making it, but that he was influenced by and acted on the apprehension he felt, that the government of the United States would confiscate the land which he conveyed to the defend-

ant. On this issue of fact the court, in its charge, correctly presented the question involved in it. The verdict of the jury determined it adversely to the appellant, that the plaintiff was induced to make the contract by his reliance on the false representations of the defendant in respect to the cattle, as charged in the plaintiff's petition. The verdict being supported by evidence to sustain the finding of the jury, it is conclusive upon this part of the case.

The defendant insisted, in respect to the other branch of the rule, viz., " that the transaction, if tainted by fraud, will be set aside, if the nature of the case and the condition of the parties will admit of it," and in its application to the facts of this case, precluded the plaintiff from rescinding the contract; and that question is presented to us on this record, under several phases. They will directly appear, in considering the instructions asked by defendant, and refused by the court.

The defendant asked the following instructions, which were refused, viz.: " That if Sparks, at the commencement of the suit, abandoned the cattle, and, by reason of such abandonment, said cattle had been lost and destroyed, and no substantial number of them now remains, and it is now out of the power of Sparks to restore the cattle to Dawson substantially as he received them, then they will find for defendant."

" That if the agents of Sparks did not take reasonable care of the cattle from December, 1865, to March, 1867, when they were in their possession, and failed to mark and brand the cattle and gather them in the spring of 1866, and drive them back into the range in the same spring, as was th? custom of stock raisers, and thereby the cattle were materially damaged in value when Sparks instituted his suit, he cannot recover."

It is maintained, under both of these propositions, that under the supposed facts recited in them, " the nature of the case, and the condition of the parties," did not entitle the plaintiff to the relief he sought, because the plaintiff, under such state of case, would not, in either instance, have been

able to restore to the defendant the consideration which the latter had paid for the property.

Instructions asked by defendant, and refused, present the same proposition, upon the hypothesis that the plaintiff had, by his contract with the Jeffries, as his stock keepers, rendered himself unable thus to restore the defendant to the condition in which he was when the contract was executed.

Under the same general qualification of the right to rescind, the defendants claimed that plaintiff was precluded from rescinding the contract by having acquiesced in the contract after the fraud was discovered, or after a period when, under the circumstances of the case, he should be conclusively held to have known of its existence, if it did exist.

The general principle of law, as laid down for application to cases which do not fall within the exceptions to the general rule, is broad and comprehensive, as it relates to both of the parties. It is, however, varied by circumstances, in accordance with the reason and spirit of the just maxims of right, upon which the rule itself is founded. The general rule is, " that a man whose interest has been affected by misrepresentation has an equity to be placed in the same situation as if the fact represented were true. If there is nothing in the nature of the case, or the condition of the parties, to prevent the court from getting the transaction set aside, the party defrauded is entitled to have it set aside, and not merely to have the representation made good. It is enough, in order to entitle him to have a rescission, to show a fraudulent representation as to any part of that which induced him to enter into the contract which he seeks to rescind." Kerr on Frauds, 334.

In the application of this doctrine, the general rule is, that " where the whole contract is contaminated with fraud, and the parties can be placed *in statu quo*, the contract may be rescinded. Where that cannot be done, or where the injured party is unwilling to have it done, then the aggrieved party must seek his redress exclusively at law." Caldwell v. Caldwell, 1 J. J. Marshall, 53; Pintard v. Martin, 1 Sm. & M. Ch., 126.

And "if the party defrauded has, by his own act, put it out of his power to replace the party against whom relief is sought, in the position in which he stood at the time of the transaction; or if third parties, without notice of fraud, have in the mean time acquired rights and interests in the matter, there can be no rescission; and nothing remains to the party defrauded but a reparation in damages." Kerr on Frauds, 336.

It is, however, as well settled as the rule itself, that where the right to rescind springs from discovered fraud, there is an exception to the rule. 2 Pars. on Con. (5th ed.), p. 780. And it is stated by that authority that the defrauded party does not lose his right to rescind because the contract has been partly executed, and the parties cannot be fully restored to their former position; but he must rescind as soon as circumstances permit, and must not go on with the contract after the discovery of the fraud, so as to increase the injury necessarily caused to the fraudulent party by the rescission. Id., p. 780 and note (v) and cases cited. Also Lane v. Latimer, 41 Ga., 171.

Under this exception, then, to the general rule, the instructions which were asked to be given, "that if the agents of Sparks did not take reasonable care of the cattle from December, 1865, to March, 1867, when they were in their possession, and failed to mark and brand the cattle and gather them in the spring of 1866, and drive them back into the range in the same spring, as was the custom of stock raisers, and thereby the cattle were materially damaged in value when Sparks instituted his suit, he cannot recover,"— was an incorrect proposition of law. For, unless during the period of time which is embraced in the instruction, the plaintiff had discovered the fraud, or unless, under the circumstances of the case, he ought to have discovered it, under the exception to the general rule which has been stated, he is not required, in order to entitle him to rescind the contract, to be able to fully restore the defendant to his former position. Whatever else may be prescribed, as being the correct rule applicable to the facts of the case, that which is

claimed .to be such in this instruction is certainly not the proper one, and it ought to have been refused. The general charge of the court contained, on this branch of the case, the following propositions, viz.:

"If a person is induced to make a contract by reason of false representations, he is not allowed to rescind the contract, if, after a knowledge of the fraud, or after he could by the use of such diligence as a prudent man would ordinarily use under all the circumstances, he delay notifying the other party, and disaffirming the contract so long that he is unable to place him in the condition (as' to the property) that' he would have been at the time of the discovery of the fraud by due diligence, or the time at which it ought to have been discovered in case due diligence was not used. But there is no limit (except a statutory one not necessary to be noticed here) to the right to rescind a contract, unless by reason of the delay after the discovery of the fraud, if due diligence was used, or after it ought to have been discovered, he is unable to restore the property in the condition in which it was at the time of the discovery of the fraud by proper diligence, or when it ought to have been discovered by due diligence.

"A party, if otherwise entitled to rescind a contract, must offer to restore the property as it is at the time of the discovery of the fraud; but a simple offer to do so, and notice of abandonment, and a refusal to rescind, is a sufficient disaffirmance to authorize the bringing of the suit.

"If you believe from the evidence and the law as heretofore given you, the plaintiff would be entitled to recover; but believe from the evidence, that, by reason of a want of proper diligence (considering the nature of the property, and all the facts and circumstances in evidence) on the part of Sparks, he failed to discover the fraud (if any) as early as' a prudent man should have done, and that by reason of such neglect and delay in offering to rescind (if he did offer .to rescind), the cattle could not be restored substantially as they were at the date when the fraud ought by proper diligence to have been discovered (which you will determine),

you will find for defendant. But if, under all the circumstances, Sparks used proper diligence to discover the fraud (if any), and immediately after the discovery offered to rescind the contract, and offered to restore the property, or abandon it as it then was, and the defendant refused, it is not material what the condition of the cattle then was — whether in their former condition or not,— as no change in their condition, under such circumstances, could affect the right of the plaintiff to recover, if otherwise he has such right."

This charge placed the right of the plaintiff to rescind the contract on the ground that he might do so by offering to the defendant the cattle as they were found to be at the time of the discovery of the fraud, provided he immediately thereafter offered to restore them to the defendant, and was not himself in default in making timely discovery of such fraud. The instruction asked to be given, in legal effect, denied the plaintiff's right to rescind, unless he was in a condition to restore to the defendant the cattle as they ought to have been, by due care and attention, irrespective of the plaintiff's knowledge or ignorance of the existence of the supposed fraud, or of the possibility, by diligence on the part of the plaintiff, to learn of its existence. The charge of the court laid down the correct rules of law, as applied to the evidence; unless, indeed, the plaintiff might have objected to the stringency of that portion of it which related to the diligence required of him to ascertain the existence of the fraud. If it be subject to that objection, it is one of which the appellant cannot complain, as the error, if such it was, affected injuriously the plaintiff and not the defendant. If no circumstance of suspicion existed at the time of the contract, or afterwards, until the discovery of the fraud, to induce apprehension or belief of its existence, it could hardly be exacted that a vendee of property, under such circumstances, should, at his peril, diligently seek for facts discovering a merely supposable fraud. See Irving v. Thomas, 6 Ship., 418. We conclude that the conditions prescribed by the charge of the court, entitling the plaintiff

to recover, embraced all the requirements of the law which the defendant had a right to exact, under the most favorable view which could be taken, in his behalf, of the evidence before the jury; and that there was no error in refusing to give the instruction which we have been considering.

We have thus shown, we think, that the plaintiff's mere inability, after the discovery of the fraud, to restore the defendant to his condition — *statu quo* — in which he was at the time of the contract, will not of itself debar him of his right to rescind the contract; but it yet remains to be determined whether, under all the facts of this case, the plaintiff is thus entitled to rescind, by offering to deliver to the defendant the cattle in the range as they ran; the defendant to take such as he might find remaining of the stock, regardless of whether losses had ensued or not from want of care on the part of the plaintiff, and without exacting from the plaintiff compensation for the missing stock. Whether, notwithstanding such supposable loss to the defendant, the plaintiff may, nevertheless, obtain the benefits of the exception to the general rule which requires, ordinarily, full restitution, and whether the exceptional rule will be satisfied by restoring to the defendant whatever remains in his control of the consideration which he originally received, provided he has not by his own act placed it out of his power, as by sale or other legal disposition of the property, thus to restore it again to the defendant.

The evidence showed that the cattle were stock cattle, ranging, as defendant testified, over several counties; that, according to the custom of stock keepers, cattle are hunted and gathered in the spring of the year, the calves branded, and the cattle then driven back to their range. The executory contract of August 26, 1865, recognized the existence of this state of things, and the impracticability of gathering the cattle at the time when the contract should be executed by the parties, for it provided that the defendant would "furnish one of his sons three months next spring to help gather the stock." The contract was executed in the fall season of the year — the 21st of October, 1865. Under the

agreements of the parties, executory and executed, it was not contemplated that the plaintiff would have the opportunity afforded him of seeing the cattle together, and verifying the defendant's statements as to their number and quality, until the spring, and after sufficient time should have elasped to gather them, with the aid to be given by the defendant's son, who, it is to be supposed, was selected on account of his familiar knowledge of the cattle, their habits and range. In pursuance of that agreement William Dawson, the defendant's son, went to the ranch in May, 1866, remained there some weeks, returned, and reported as a result that he could find only fourteen head of the cattle. At that time plaintiff was absent in the state of Mississippi on business, where he remained until December, 1866, having been detained by sickness. Just before he returned he learned, for the first time, the result of William Dawson's efforts to gather the stock of cattle, and immediately hastened home, and, according to the testimony of the defendant, in December, 1866, the plaintiff, charging him with having made misrepresentations to him in regard to the cattle, proposed to him "to rue back," which proposal he refused to accept. The testimony of the plaintiff also shows a definite offer to rescind the contract, with an offer to reconvey to the defendant the cattle and land he had received from him, and to deliver back to him the bill of sale to the cattle and the bond for title to the land. The testimony of Scott is corroborative of that of both the parties as to offer and refusal, and need not be stated more fully in this connection.

In Masson v. Bovet, 1 Denio, 69, a suit for rescission of contract on the ground of fraud, it was held that where the party who practiced the fraud has entangled and complicated the subject of the contract in such a manner as to render it impossible that he should be restored to his former condition, the party injured, upon restoring, or offering to restore, what he has received, and doing whatever is in his power to undo what has been done in the execution of the contract, may rescind it and recover what he has advanced.

The same rule will apply, it seems, if he has been prevented from restoring by the fraud itself. 2 Parsons, Con. (3d ed.), sec. 13., tit. "Fraud," p. 278 and notes, note (q), where it is added that an offer to return is as effectual as actual return. Citing 5 Blackf., 225; 9 Porter, 420; 2 Ala., 181. And "in case of fraud, the defrauded party is required to return no more than he received, even though it may not place the other party *in statu quo.*" 2 Pars. Con. (3d ed.), note (s), p. 279.

In Scott *v.* Perrin, 4 Bibb, 360, the court decreed a re-scission of the contract where the sale was made of a negro slave, on the ground of fraudulent misrepresentations as to the faithfulness of the negro, he proving to be a faithless servant of infamous character, and a notorious runaway. In that case, the negro ran away a few weeks after the sale; was never heard of afterwards. The complainant in the bill could not and did not offer to return the negro, nor otherwise offer to place the defendant *in statu quo.*

And under the same principle as that contained in the case of Masson *v.* Bovet, it is held in Tibbs *v.* Timberlake, 4 Litt. (Ky.), 12, that where time is necessary to ascertain whether a fraud has been committed in the sale of property or not, an offer to return the property recently after the contract is not necessary; all which can be required is an offer to return it recently after the discovery of the fraud.

In this case, applying the foregoing principles to the facts found in favor of the plaintiff, it may be correctly said that his inability to place the defendant precisely *in statu quo* is traceable directly to the fraud and its concealment, and his reliance upon the truth of the representations which the de-fendant had made to him; and that he offered to restore to the defendant all that he had received from him, in the same condition it was in when the contract was made, with-out fault or any culpable neglect or delinquency justly im-putable to him.

In such a case, the inability to restore the party who has committed the fraud to his former condition, which will pre-vent a rescission of the contract for discovered fraud, must

be attributable to some fault on the part of the complainant, or else it must arise from such dealing by him with the property by his own voluntary act as to have disabled him to control it, and thereby to restore its possession and enjoyment to the other party. In Veazie v. Williams, 8 How., 158, Justice Woodbury said, in considering this doctrine, "if the plaintiff has sold the property, or disabled himself from returning it, when ordered by a decree, then the evil consequences will light on himself, and not on the defendant; that is what is meant by inability to restore the property, in 8 Cranch, 476." And see Gatling v. Newell, 9 Ind., 572.

Under the reason of the same rule of law, it has been held that a man is not bound to keep the property in a state of preservation until bill filed for rescission, if it is of a perishable nature. Kerr on Frauds, 337, and authorities there cited. Also, that, under special circumstances, a transaction may be partially rescinded, but the court will never adopt such a course, unless it can see clearly that no injustice will be done. Bradley v. Bosley, 1 Barb., 125. Also, that if the transaction is severable, inability to rescind it as to a part is not fatal to the right to rescind it as to another part. Kerr on Frauds, 336, and authorities cited.

The general rule with its qualifications is thus stated in Coffee v. Ruffin, 4 Cold. (Tenn.), 516: "It is true, as a general rule, that a contract will not be rescinded when it is out of the power of the court to place the parties *in statu quo;* but this rule is subject to some qualification, and applies only to such cases as, in which, by such rescission, one party would be enabled to obtain a fraudulent advantage of another, and not to cases where one party has by fraud obtained an inconscionable advantage of another, and such rescission would manifestly be in furtherance of justice, and the court has it still in its power to reach and enforce the equities of the parties arising upon the rescission."

Many of the cases to which we have been cited in the brief of the appellant's counsel are those coming under the general rule, and are wanting in the elements which would subject them to its exceptions and qualifications, as in Bu-

chanan v. Homly, 12 Ill., 338; and in Burge v. Cedar Rapids & Mo. R. R. Co., where the complainant had derived advantage from partial performance, and attempted to rescind because of the non-performance of the residue, relief was refused.

Or where the offer to rescind did not extend to the whole contract; as where an important part of the consideration had been expended so that it could not be restored — relief refused. Edwards v. Hanna, 5 J. J. Marsh., 26. It was said in that case, however, that if it had been of small amount, and considered as an unimportant part of the contract, the relief would have been granted.

Or where the party complaining cannot, by reason of his own fault, or does not offer to, return the consideration received, as in Camplin v. Burton, 2 J. J. Marsh., 216; Shaw v. Barnhardt, 17 Ind., 186; Shepherd v. Fish, id., 230; Howard v. Cadwalader, 5 Blackf., 225; Davis v. James, 4 J. J. Marsh., 9.

Or where the complainant does not offer to seek to rescind promptly on the discovery of the fraud, as in Central Bank v. Pindar, 46 Barb., 469, when several years had elapsed after such discovery.

In this case, if the defendant's representations were false, and relied upon by the plaintiff during the seasons of the year during which he was not expected to gather, mark, brand, or otherwise provide for them, nor until they could be gathered by the agency of the defendant, according to contract; and if during that time, whilst the plaintiff had the right to consider the cattle as his own property, and that they consisted of gentle stock readily controlled and easily penned, and under such circumstances did not see fit to give special superintendence to them, regarding the hazard of loss to be his own risk, and not that of the defendant, if the stock of cattle were lost, scattered or otherwise diminished in value or numbers, whilst the plaintiff remained ignorant of the fraud, the conduct of the defendant in thus misleading him would estop him from objecting to receive the cattle as they were to be found in the range, and as they had been delivered to the plaintiff. If the plaintiff was un-

able to restore the entire stock of cattle which had been sold to him under the supposed state of facts, his inability would have arisen from his unconsciousness of the necessity of treating the property as the proper subject of care, in order to enable him to make the required restitution, and not under the circumstances from any fault or laches on his part.

Until the discovery of the fraud, its concealment from him would have operated to prevent him from securing his interest, and unquestionable right to rescind, by restoring the cattle without loss as to numbers or otherwise. His inability so to do would be traceable directly to the confidence and reliance placed by him in the defendant's representations, the fraud and its concealment; and not until its discovery could he be required to have taken steps, at the peril of his right to rescind, to place the defendant *in statu quo.* The offer, under the circumstances of the case, to return the cattle as he received them, made immediately after the discovery of the fraud, was, we think, sufficient to entitle him to a rescission of the contract.

The other proposition which denied the plaintiff's right to rescind the contract by reason of a supposed diminution of the number of the cattle is embraced in the instruction asked by the defendant, which has been already quoted, and is as follows: "That if Sparks, at the commencement of the suit, abandoned the cattle, and by reason of such abandonment said cattle had been lost and destroyed, and no substantial number of them now remains, and it is now out of the power of Sparks to restore the cattle to Dawson substantially as he received them, then they will find for the defendant."

The plaintiff's petition admits that he abandoned the cattle when the suit was brought; and the evidence shows that he did not have anything to do with them afterwards; nor did his stock keepers after learning of the pendency of the suit; that they were instructed by the plaintiff to pursue that course.

To entitle a party to a decree rescinding the contract for

fraud, he must offer to return the property which he has received before the institution of his suit, and if he has made a proper offer to return the property, or tendered the same to the other party, and in all other respects is entitled to have a rescission of the contract, and the party who has committed the fraud refuses to accept it, the complainant will have done all that the law requires of him, and he will not be held bound to keep and preserve the property longer after the filing of his suit. "An offer to return the chattel in a reasonable time," it is said in Di l v. Camp, 22 Ala., 259, "on the breach of a warranty, o ' where a fraud has been practiced on the purchaser, is equivalent, in its effect upon the remedy, to an offer accepted by the seller, and the contract is rescinded." As to the discrimination to be made in respect to those cases where the property must be actually tendered, and where an offer to deliver will be equivalent to such tender, need not be considered, for, in this case, the defendant dispensed with the necessity of the plaintiff's making the tender by his unqualified refusal to rescind the contract, and to restore the plaintiff's land to him, or to accept the restitution of the cattle and the ranch which had been by him sold to the plaintiff. If, however, it became necessary to apply the most stringent test to the legal effect of the plaintiff's offer to restore to the defendant the cattle by surrendering to him the possession of them as they then were in the range — just as he had received them,— and to surrender to him the bill of sale he had received from the defendant to them, and the bond for title to the land, in view of the nature and habits of the cattle as both parties had recognized them to be in their contract, and as shown to be by the evidence of stock men, and in view of the season of the year — December — when they could not be gathered together, and the distance apart at which the parties resided from each other, such offer would have been sufficient and equivalent to a tender to the defendant of the cattle. But, as held in Tibbs v. Timberlake, 4 Litt. (Ky.), 12, "a tender of the property is not requisite, if, on application, the seller declares that he will not receive it; he, by

such declaration, renders a tender unnecessary." On the same subject, it is remarked in the opinion in Dill *v.* Camp, 22 Ala., 259, "where the parties reside at a distance from each other, a simple offer to return would, doubtless, be all that the law requires."

Where the complainant has placed himself *rectus in curiæ,* by offering to rescind the contract, and tendering the property, or offering to surrender or deliver it, as the case may be, to the other party, it is laid down upon high authority, that "his only duty is to do nothing with the property after bill filed; and in cases where damage is likely to occur, and might be prevented, he ought, perhaps, to give intimation to the defendant, leaving him to do what he pleased." Kerr on Frauds, 337, and authorities there cited. And so it has been held that a party seeking to set aside a sale of shares is not bound to pay calls on them, to prevent forfeiture, after filing his bill. It is not fatal to his right of rescission that some of the shares may have been forfeited for non-payment of calls since bill filed (2 N. R., 514; 4 N. R., 15; 12 W. R., 740). Id., 337. We conclude, upon these authorities, that it was clearly not error to refuse to give the instruction, and that the charge of the court, on the question which was involved in the instruction, presented correctly the law of the case.

The appellant assigns as error the refusal of the court to instruct the jury "that if they believed from the evidence that Sparks had made a contract with the Jeffries to keep the cattle for three years for a percentage of the increase, and this contract was not rescinded when the suit was brought, and the Jeffries were in possession of the cattle when the suit was brought, the plaintiff could not recover."

It appeared from the evidence that Sparks contracted in November, 1865, to give the two Jeffries one-fourth of all the calves that should be branded, for their services as stock keepers for three years. This suit was filed December 21, 1866; they quit keeping the cattle as soon as they learned of the pendency of the suit. They gave up the management of the cattle about March, 1867. One of the Jeffries testi-

fied that he kept the cattle about one year, and that he quit without any special direction from Sparks or Dawson. Sparks testified that he directed them to have nothing to do with the cattle. It does not appear from the testimony that any calves were branded whilst the cattle were in charge of the Jeffries, nor what number there were to be branded.

The evidence fails to show that the existence of this contract entered into the defendant's consideration, or that he made its existence a cause of objection to the acceptance of the plaintiff's offer to rescind the contract. If he had done so, the plaintiff might have been able to have removed whatever obstacle, real or imaginary, offered by it to the complete resumption of his former possession and ownership. The contract was not such an one as deprived Sparks of the power to sell and dispose of the original stock of cattle, and it does not appear from the evidence that the Jeffries had, at the time of plaintiff's offer to rescind, acquired any right of property in their increase; and if he had done so, to the extent of an inconsiderable portion of the calves, and if that part of the stock could not have been restored in specie, it would seem, from the principles of equity applicable to the rescission of contracts, that relief would nevertheless have been granted under such proper decree as would do justice to both parties. The plaintiff's inability to put the defendant precisely *in statu quo* would not preclude a decree for the rescission of the contract. Gatling *v.* Newell, 9 Ind., 572. It devolved upon the defendant to establish the defense of plaintiff's inability to rescind, growing out of the contract with the Jeffries, and as inability so to do did not necessarily result from the making of it, but would, if at all, result from the incidents and consequences of having made it, it was not error for the court to refuse to give the instruction asked. The charge which was given by the court on the subject negatived the plaintiff's right to recover upon the following hypothesis, viz.: "If Sparks did not cancel the contract with the Jeffries, and the latter, at any time during the three years after a disaffirmance of the contract (if it was disaffirmed by Sparks), acting under said

contract, disposed of the cattle, or any number of them, they would find for the defendant; but if the Jeffries abandoned or canceled the contract, and afterwards dealt with the cattle, Sparks is not responsible therefor for any act of theirs after the expiration of the three years." The rights of the defendant, under these propositions, were protected as fully as he had a right to claim; and he asked for no other additional charge in respect to them, except the counter instruction which has been already considered. Johnson v. Granger, 51 Tex., 42; Texas Land Co. v. Williams, 51 Tex., 51. The charge, as given, was not erroneous; if it be subject to objection, it may be that it prescribes too stringent a rule against the plaintiff in denying his right to recover in case the Jeffries had disposed of any number, however inconsiderable, of the cattle which were in their charge. The charge cannot be complained against as erroneous by the defendant, nor was there any error in the refusal to give the counter instruction asked for by him. Under the evidence, the charge given could not have worked an injury to the defendant, and therefore the giving of it, even if it had been improper, would afford no ground for reversal. 42 Tex., 214.

It is assigned as error that the court refused to give the following instruction, asked by the defendant, viz.:

"If the jury believe, from the evidence, that Sparks went to Comanche county, and to the range of the cattle sold to him by Dawson, in November, 1865, or about that time, and remained there sufficiently long to learn the number and quality of the cattle; and at that time appointed an agent to take charge of the cattle, who then had full knowledge of the number and quality of the cattle, then Sparks is presumed in law himself to have known, at that time, what was the true number and quality of the cattle; and if the jury further believe, from the evidence, that Sparks acquiesced in the trade, and made no complaint until about the time this suit was commenced, then Sparks thereby lost the right to bring any suit to rescind the contract, and the jury will find for the defendant."

A charge asked to be given, which gives undue prominence to isolated facts, should be refused. Gray v. Burk, 19 Tex., 232; Powell v. Messer, 18 Tex., 405; Duffell v. Noble, 14 Tex., 655. The facts which were hypothetically embodied in the charge asked constituted but a part of the entire evidence tending to establish knowledge of, and acquiescence in, the fraud, and it was the province of the jury to determine the question of acquiescence in the contract from all the evidence before them. Hollingsworth v. Holshousen, 17 Tex., 48. It was error to single out isolated facts, rendering them thus prominent, and indicating to the jury that, in the opinion of the court, their belief respecting them alone would determine the fact of knowledge of the fraud on the part of Sparks. The charge must not lead the jury to infer what is the opinion of the judge upon facts. 25 Tex., 215; 28 Tex., 228. It was a comment upon the weight and conclusiveness of certain of the facts. Kimbro v. Hamilton, 28 Tex., 566. Besides, it would have manifestly been error for the court to instruct the jury that Sparks was conclusively presumed by the law to have been made acquainted by the Jeffries as to the number and quality of the cattle, by reason merely of their having had a knowledge concerning the stock before Sparks employed them as stock keepers. Their knowledge on the subject, and Sparks' opportunities to ascertain from them what they knew, were merely facts or circumstances which the jury might consider in connection with the other evidence; but under the facts, if Sparks had had no apparent reason to distrust the truthfulness of the representations which Dawson had made to him concerning the cattle until he learned of it in the state of Mississippi, he would not have been placed in a position where it could reasonably be concluded that he had sought to learn from the Jeffries what they or others may have known concerning the cattle; and, in such case, the fact referred to in the instruction, in relation to the knowledge of the Jeffries, would not have been even a weighty circumstance from which to draw the conclusion that they had communicated such information as they had to Sparks; far less might it, therefore, be re-

garded as a conclusive legal inference. The instruction is otherwise objectionable, in not limiting the supposed acquiescence of Sparks from the time when he discovered the fraud, or when he ought, under all the circumstances of the case, to have discovered it.

The legal consequence of the delay of the plaintiff to bring his suit for more than a year after the execution of the contract, as affecting the question of acquiescence on his part, and to defeat the action, is presented under other assignments of error, among which is the following: " The court erred in the twenty-first paragraph of the charge, because the court instructed the jury that Sparks could bring this suit to rescind on the ground of fraud, without regard to the time intervening between the discovery of the fraud, or the time in which it might have been discovered and the institution of the suit, provided the property received from Dawson could be returned to Dawson in as good condition as when he discovered the fraud, and provided he was not barred by the statute of limitations."

The paragraph referred to, together with that which succeeds it, has been quoted literally already in this opinion, and reference is here made to the purport of both of them without again setting them out. The phraseology used in the twenty-first paragraph, in stating that " there is no limit (except a statutory one, . . ) to the right to rescind a contract, unless, by reason of the delay, . . he is unable to restore the property in the condition in which it was at the time of the discovery of the fraud by proper diligence, etc.," . . . is subject to criticism, if viewed as a proposition of law applicable to the entire subject of the right of a party to rescind a contract for fraud. For, " it is settled as a sound rule of equity jurisprudence, that a party asking for the rescission of a contract deliberately entered into must make his election with all due promptness. He must take his stand at once, and at the time. Neither law nor equity permits him to alternate and see-saw from one side of the fence to the other, speculating upon contingencies to determine which of the two to choose." 3 Johns.

Ch., 23; 17 Johns. Ch., 437; Lowber *v.* Selden, 11 How. Prac., 527.

" If, after discovering the fraud, he continues to act under the contract, his right of rescission is thereby waived." Downer *v.* Smith, 32 Vt., 7; Silway *v.* Fogg, M. & S., 83; Saratoga R. R. Co. *v.* Row, 24 Wend., 74. " A party who is entitled to rescind a contract must seek the remedy with reasonable diligence, and cannot wait for an indefinite period, and, without giving an excuse for the delay, obtain the relief to which he might have been entitled, upon a more prompt assertion of the right." Barfield *v.* Price, 40 Cal., 542. See, also, Disbrow *v.* Jones, Harrington's Ch., 102; Akerly *v.* Vilas, 21 Wis., 88. " The mere lapse of time, if it be considerable, goes far to establish a waiver of this right; and if it be connected with an obvious ability on the part of the defrauded person to discover the fraud at a much earlier period, by the exercise of ordinary care and intelligence, it would be almost conclusive.' ' 2 Pars. Con., 782.

The proposition, however, which the twenty-first paragraph of the charge aimed to present to the jury, was intended to instruct them as to the effect of the time that elapsed from the execution of the contract upon the plaintiff's right to rescind, with reference to his obligation to restore the property in its former condition to the defendant; in that respect they were instructed that if his inability to do so resulted from the plaintiff's delay or laches after the discovery of the fraud, or after a period when he ought to have discovered it, he could not rescind; and that if there was on his part no such delay or laches after the discovery of the fraud, or after a period when it ought to have been discovered, his inability to restore the property in its original condition would not be affected by time, except under the operation of statutes of limitation.

In the connection in which the language of the twenty-first paragraph was used, and in the sense in which it was doubtless meant, and so probably understood, the proposition, as applied to the subject which was thus presented, was correct. The proposition presented to the jury was as to

the effect of change, by loss or otherwise, in the condition of the cattle after the discovery of the fraud, or after it might have been discovered by due care; and it in effect held that if the plaintiff was not in such default as the charge specified, change in the condition or number of the cattle would not affect his right to restore them in the condition they were when the offer to rescind was made, irrespective of the time that may have elapsed since the making of the contract; otherwise, if he was in such default, and changes had occurred to prevent him from making such restitution according to their condition at the discovery of the fraud; and in the latter case, he could not recover. The twenty-second paragraph of the charge presents to the jury directions by which they are required to apply the propositions contained in the twenty-first paragraph and those which precede it, and it prescribes the following requirement to entitle the plaintiff to recover: " But if, under all the circumstances, Sparks used proper diligence to discover the fraud (if any), and immediately after the discovery offered to rescind the contract, and offered to restore the property or abandon it as it then was, but the defendant refused, it is not material what the condition of the cattle then was — whether in their former condition or not,— as no change in their condition under such circumstances could affect the right of the plaintiff to recover, if otherwise he has such right."

The section of this paragraph which precedes the above quotation applied the above principle in favor of the defendant's right to defeat this action, as will be seen by referring to it in this opinion in another place. It will therefore be seen that paragraphs twenty-first and twenty-second did not have application to the effect of time as an element affecting the doctrine of election of remedy, or waiver of right, and as evidence tending to show acquiescence; but both of them related to the subject as we have stated our construction of them to be. There was no error in the charge complained of which could have had an improper effect on the rights of the defendant. It did, however, prescribe the rule to the plaintiff in its extreme stringency, in requir-

ing the jury to be satisfied, to entitle the plaintiff to recover, that Sparks, immediately after the discovery of the fraud, offered to rescind the contract and to restore the property; and possibly, also, in requiring, as a like condition, that Sparks had used proper diligence to discover the fraud, in view of all the circumstances of the case.

It was held in Downer *v.* Smith, 32 Vt., 7, "that when one rescinds a contract on the ground of fraud, he is only bound to do so with all reasonable dispatch after he has discovered the fraud; and he does not lose his right to rescind, because at that time the contract has been in part executed, and the parties cannot, for that reason, be fully restored to their former position." What period shall be deemed to be a reasonable time within which a party, entitled to rescind, shall offer to do so, must depend upon the particular facts and circumstances of the case. Buford *v.* Brown, 6 B. Mon. (Ky.), 554.

Whether Sparks should have been required to use diligence to discover the fraud would depend on whether, under the circumstances, he had any reasonable grounds to believe that he had been imposed upon by the defendant's representations. If no circumstances of suspicion existed at the time of the contract, or afterwards, until the fraud became known to him, to induce the apprehension of its existence, it is against reason to expect that he should diligently inquire for facts concerning its mere possible existence. It was held in Irving *v.* Thomas, 6 Ship., 418, that a party cannot be justly regarded as confirming a contract believed even to be fraudulent, because he did not repudiate it at an earlier period, upon a mere violent presumption of fraud, instead of waiting until he can clearly establish it. And, *a fortiori*, it would seem that a party who has been defrauded by false representations, on which he relies, and has no cause to suspect their untruth, is not to be deemed as having waived the fraud, or as confirming the contract, unless, notwithstanding these facts, he shall nevertheless use diligence to ascertain whether a fraud has been committed or not.

The more consummate the fraud, the more artful the

devices employed to effect a contract whereby the confidence of the defrauded party is secured and induced to enter into it, so much the less will the injured party be furnished with apparent grounds for distrust, and therefore the more justified in not using diligence to discover the reality of the imposition.

Under these views of the charge of the court, we conclude that there was no error in it of which the appellant can complain, and that the jury were not misled by any expression contained in it to the defendant's injury. It may be added, in conclusion, that, saving the criticism to which the solitary sentence in paragraph twenty-first, to the effect that there is no limit to the right to rescind a contract, except a statutory one, may be subject, the charge is otherwise correct and clear, and presents a single proposition of law, in no wise complicated with the effect of time upon the rights of the parties. The expression referred to, taken in connection with the entire charge, was doubtless meant to express the idea that no lapse of time, during which the fraud was not discovered, nor could by the exercise of diligence have been discovered, will affect the plaintiff's right to rescind after it shall be discovered. The court did not charge upon the effect of acquiescence by the plaintiff in the contract after the discovery of the fraud; nor did the defendant ask any instructions applicable to that defense, except so far as to those which we have considered in this opinion. We conclude, therefore, that taking the twenty-first and twenty-second paragraphs together they were not misleading, and that the assignment of error is not well founded. Able v. Lee, 6 Tex., 427; Salinas v. Wright, 11 Tex., 287; Carter v. Eames, 44 Tex., 544; Hollingsworth v. Holshousen, 17 Tex., 41.

There are many other assignments of error. We have carefully considered them; they are not supported in the brief of appellant's counsel by authorities, nor do they appear to be relied upon as presenting questions of vital importance, further than as they may be connected with or involved in the various assignments of error which we have considered.

We do not perceive from any of them that any error is shown for which the judgment ought to be reversed. It is our opinion, on the whole case, that the judgment of the district court shall be affirmed, and we shall award accordingly.

AFFIRMED.

[Opinion delivered January 17, 1881.]

